IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BENJAMIN SMITH,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br>Case No. 2:13-CR-776<br><br>Judge Dee Benson |

This matter is before the court on Defendant Benjamin Smith's motion to suppress. (Dkt. No. 20.) On May 12, 2014, the court conducted an evidentiary hearing on the motion. Defendant was present with his counsel, Emily A. Swenson. The government was represented by Mark K. Vincent. Following the hearing, Defendant ordered a transcript and the parties stipulated to a briefing schedule. On June 9, 2014, Defendant filed a Memorandum in Support of Motion to Suppress. The government filed a response in opposition on June 27, 2014.

1

Defendant filed a reply to the government's response on July 10, 2014. After thorough review and consideration of the memoranda submitted by the parties, and the testimony presented at the evidentiary hearing, the court now enters the following Memorandum Decision and Order.

**FINDINGS OF FACT**

The court finds the relevant facts as follows.[1] At approximately 10:00 p.m. on August 1, 2013, South Salt Lake Detective Brandon Singleton and Sergeant Garcia[2] (Utah Highway Patrol, State Bureau of Investigation) were both patrolling near the intersection of 500 East and 2100 South in Salt Lake City[3] in plain clothes and in an unmarked but obvious police car (black Dodge Charger). (Tr. at 5-7, 59-60.) The officers noticed two males, one white and the other a Pacific Islander, with a silver BMW vehicle parked facing east at the gas pump directly next to the gas station/convenience store located on the southeast corner of that intersection. (Tr. at 7-8, 10, 59-62; Government Ex. 1.) The officers observed the two males tinkering inside the engine compartment of the BMW. (Tr. at 7, 60.) This conduct caught the officers' attention because they were aware, based upon their regular encounters with narcotics dealers, that dealers often hide narcotics inside their vehicle's engine compartment. (Tr. at 7, 62.)

---

[1] Reference to the transcript of the evidentiary hearing conducted on May 12, 2014, will be cited as "Tr. at __."

[2] Detective Singleton has been a police officer for 12 years, is POST certified, and has been assigned to the Gang Unit for the last 2 years. (Tr. at 6.) He has on the job training doing narcotics investigations. (*Id*.) Sergeant Garcia has been a peace officer for 12 years and is POST certified. (Tr. at 58-59.) He has received training and has attended many schools for conducting narcotic investigations. (*Id*.) He was previously certified as a Drug Recognition Expert. (*Id*.)

[3] This area of town is one where the metro gang unit consistently deals with criminal activity involving gangs, narcotics, and stolen vehicles. (Tr. at 61.)

Based on their suspicions, the officers pulled their car into one of the gas station parking stalls on the west side of the gas station to observe the two men. (Tr. at 7-8, 60; Government Ex. 1.) From that position, the officers were able to continuously observe the two men and the BMW. (Tr. at 10, 60.) The two men knew the officers were watching them. (Tr. at 60.) After a few moments, the two men got into the BMW and proceeded to drive off. (Tr. at 11.)

As soon as the BMW pulled away from the gas station towards 2100 South, the officers followed it. (Tr. at 61.) In their pursuit, both officers observed that the BMW did not stop or signal before entering 2100 South, traveling eastbound.[4] (Tr. at 11-12, 28, 61.) The officers observed the BMW turn onto 2100 South and accelerate at a high rate of speed. (Tr. at 12, 29.) The speed limit on 2100 South is between 30 and 35 miles per hour. (Tr. at 12.) The officers were traveling five to ten miles over the speed limit in their attempt to catch up to the BMW, but were unable to close the gap. (Tr. at 13, 30.)

At 600 East, the BMW turned right traveling southbound, and by the time the officers reached 600 East 2100 South, the BMW was already turning right to travel westbound onto Commonwealth Avenue (approximately 2125 South). (Tr. at 12.) As the officers turned right onto Commonwealth Avenue at 600 East, they observed the BMW already turning northbound onto 500 East. (*Id*.) The speed limit for 600 East Commonwealth, and 500 East, is 25 miles per hour. (Tr. at 13.) Sgt. Garcia testified that the BMW was traveling obviously well above the 25 mile per hour speed limit. (Tr. at 69.) The officers were also traveling well over the speed limit

---

[4] Utah and Salt Lake City law requires vehicles emerging from alleys, buildings, private roads, or driveways to stop prior to a sidewalk area or street. (*See* Utah Code Ann. § 41-6a-907 (2005); Salt Lake City Traffic Code § 12.48.040(B) (2009).) Failure to signal is also a violation of Utah and Salt Lake City law. (*See* Utah Code Ann. § 41-6a-804 (2007); Salt Lake City traffic Code § 12.44.130(A-B) (2009).)

as Sgt. Garcia observed their speedometer at approximately 40 miles per hour. (Tr. at 71.) During the pursuit the officers observed that even though they were traveling at least the speed limit themselves, the BMW was continuously pulling away from them. (Tr. at 13, 69, 71.)[5]

The officers eventually caught up with the BMW and saw it pull back into the same gas station where they first spotted the two men. (Tr. at 14,15.) The officers then activated their vehicle's police emergency lights to conduct a traffic stop. (Tr. at 14-15, 63.) As the officers pulled behind the BMW, the driver, Defendant, and the passenger both exited the BMW and began walking away from it. (Tr. at 15, 63, 72.) The officers exited their vehicle and instructed the two men to get back into the BMW, which they did not do. (Tr. at 15, 46-47, 64.) The officers then instructed the men to sit down. (*Id.*) The Defendant complied by sitting on the curb of the gas pump island nearest to the driver's side of the vehicle. The passenger would not comply with either officer's request to sit down. (Tr. at 72-73, 80.) In response to the passenger's aggressiveness, both officers placed their hands on their guns, however, neither officer drew his gun. (*Id.*) The passenger eventually complied with the officers' commands and sat down on the curb by the store, on the passenger side of the BMW. (Tr. at 15, 46-47, 63-64.) The men were neither handcuffed, nor were they told they were under arrest. (Tr. at 49.)

Detective Singleton asked Defendant for his identification, registration, and proof of insurance. (Tr. at 11, 15-16, 63.) Defendant did not provide identification documentation, but did give his name, date of birth, and social security number. (Tr. at 16.) Defendant indicated

---

[5]Speeding is a violation of Utah and Salt Lake City law. (*See* Utah Code Ann. § 41-6a-601 (2005); Salt Lake City Traffic Code § 12.36.120(B) (2009).) Utah law also prohibits "careless driving" which is described as a person operating a motor vehicle and committing two or more moving traffic violations in a series of acts within a continuous period of driving covering three miles or less in total distance. (*See* Utah Code Ann. § 41-61-1715 (2010).)

that the BMW belonged to his roommate. (Tr. at 32.) Detective Singleton asked Defendant if there was anything they needed to know about what was inside the vehicle. (Tr. at 47, 64.) Based on Defendant's behavior prior to the stop, Detective Singleton was concerned that there might be drugs or weapons in the car that could cause somebody or the officers harm. (Tr. at 48.) Defendant told Detective Singleton that there was a gun and marijuana in the BMW. (Tr. At 19, 44-45, 47-48.) Detective Singleton examined the inside of the BMW through the driver's side window and observed a handgun in a holster protruding from under the seat. (Tr. at 19-20, 45; Government Ex. 2.) Defendant was then placed in handcuffs. (Tr. at 20-21, 65.)

Sgt. Garcia identified the passenger of the BMW as Jonas Faafia ("Faafia") through a State issued I.D. (Tr. at 17, 74.) Detective Singleton informed Sgt. Garcia that Defendant admitted that there was a firearm in the BMW. (Tr. at 66, 75.) Sgt. Garcia provided Detective Singleton with Faafia's identification card so that Detective Singleton could run Faafia's information through a police database on his computer. (Tr. at 16-17, 74.)

While Detective Singleton was in his car on the computer, Sgt. Garcia escorted the Defendant away from the gas pumps so that Defendant could smoke a cigarette. (Tr. at 65.) While they were standing there, Defendant spontaneously told Sgt. Garcia that he was just trying to be honest and that he knew he was not supposed to have a firearm because he had been to federal prison. (Tr. at 66.) Defendant continued by telling Sgt. Garcia that he used the firearm for protection. (*Id*.) Defendant also told Sgt. Garcia that he was very concerned and did not want the officer to remove the firearm from the BMW in front of Faafia or others in the area. (*Id*.)

5

Detective Singleton discovered that Defendant's driver's license had expired. (Tr. at 16, 49.) Detective Singleton also discovered that Faafia had an active arrest warrant. (Tr. at 17, 74.) Detective Singleton advised Sgt. Garcia of Defendant's expired driver's license and Faafia's outstanding arrest warrant. (Tr. at 17, 74, 77.) Faafia was then handcuffed and another officer was called to transport Faafia to jail. (Tr. at 17-18, 74.)

Because neither Defendant nor Faafia could drive the BMW away from the scene, Detective Singleton requested a hold-for-owner impound. (Tr. at 18.) South Salt Lake Police Department's vehicle impound policy requires an inventory of the vehicle's contents to be made prior to the car being towed. (Tr. at 18.) Detective Singleton placed Defendant in the police car and called for a tow truck and K-9 unit for the impound and drug search. (Tr. at 18, 20-21.)

While Detective Singleton was waiting for the tow truck to arrive, he got inside the police car where Defendant had been placed and read Defendant his *Miranda* rights. (Tr. at 20.) Defendant indicated to Detective Singleton that he understood his *Miranda* rights and that he was willing to waive them and speak with police. (Tr. at 21.) During the subsequent interview, Defendant admitted that he had previously been incarcerated in federal prison and that he knew he was not supposed to possess a firearm. (Tr. at 22.) Defendant also admitted that he had the firearm for protection while he deals drugs. (*Id*.)

After Defendant's interview, the BMW was searched. (Tr. at 22.) Inside the trunk the officers found a backpack that contained drug paraphernalia, an electronic scale, a crystal like substance that field-tested positive for methamphetamine, and a green substance that field-tested positive for marijuana. (Tr. at 22-23.) The BMW was then towed from the scene.

Defendant was later released from his handcuffs and was told that he was free to leave because he had agreed to cooperate as a confidential witness for the officers. (Tr. at 78.)

Defendant filed the instant motion seeking to suppress all evidence discovered by the officers after they stopped the BMW on grounds that the officers did not have reasonable suspicion for the stop, and/or for violating Defendant's *Miranda* rights after the stop. The court disagrees with Defendant and finds his arguments unpersuasive. The court finds, as a matter of fact and law, that the officers had reasonable suspicion to stop the BMW based on observed traffic violations, and that the officers did not violate *Miranda* by asking Defendant questions after the stop.

Under all the factual circumstances, the court finds that the officers had reasonable suspicion to stop the BMW and to question Defendant before reading him his *Miranda* Rights.

## **DISCUSSION**

A traffic stop is a "seizure" under the Fourth Amendment and is analyzed under the framework set out in *Terry v. Ohio*, 393 U.S. 1 (1969), for investigative detentions. *United States v. Trestyn*, 646 F.3d 732, 741,-42 (10th Cir. 2011). The *Terry* framework requires a stop to be justified at its inception by an objectively reasonable suspicion that the person detained has committed or is about to commit a crime. *United States v. DeLaCruz*, 703 F.3d 1193, 1196 (10th Cir. 2013); *United States v. Gregoire*, 425 F.3d 872, 876 (10th Cir. 2005). "An observed traffic violation or a reasonable suspicion of such a violation under state law plainly justifies a stop." *Id*. at 876. A court should only look at whether the stop was objectively justified in determining its legality. *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009). Thus, a court's "sole inquiry is whether a particular officer had reasonable suspicion that a particular motorist violated

'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction."
*United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) (*quoting Delaware v. Prouse*, 440 u.s. 648, 661 ((1979)).

Defendant asserts that the officers were not justified in stopping the BMW driven by Defendant. The court disagrees.

    I. <u>The Officers Were Justified in Stopping the BMW Based on Observed Traffic Violations</u>

        1. *The officers observed the BMW fail to stop before turning onto 2100 South*

The officers have provided the court with sufficient evidence to show that they had reasonable suspicion to stop the BMW based on violations of state and local traffic codes. At the evidentiary hearing both officers credibly testified that they observed the BMW fail to stop before turning right going eastbound onto the 2100 South roadway as is required by law. (Tr. at 11-12, 28, 62-63, 68, 70; *see* Utah Code Ann. § 41-6a-907 (2005); Salt Lake City Traffic Code § 12.48.040(B) (2009).)

Defendant asserts that the testimony given by the officers, that the BMW failed to stop, should not be credited. (Dkt. No. 30 at 6.) In support, Defendant relies on a self-produced video taken at a later date in the area surrounding the gas station in question. Defendant claims the video is an identical re-enactment of what the officers saw at the time of the incident. (Tr. at 41.) Defendant claims, based solely on the video, that "the officers view of the BMW was likely impeded by the pumps and other obstacles at the station" because "the officers were not in a good position to be able to see." (Dkt. No. 30 at 6.)

8

The United States asserts that the video is not an identical re-enactment of the events in question because it does not support Defendant's claim that the officers could not see the BMW's failure to stop violation. During testimony at the evidentiary hearing, Sgt. Garcia indicated, as he watched the video clip, that they (the officers) were "a little further over" to the right from the view portrayed in the video. Sgt. Garcia also testified that he could see that the BMW never stopped prior to entering 2100 South, a clear violation of the law.

The court finds Sgt. Garcia's testimony credible. The video was not, nor does it claim to be, taken from the vantage point of the officers, nor does it reflect the lighting at the time of the events in question. The only weight the court gives the video is that it shows the gas pumps and roughly the area where the officers were. Given the totality of the evidence presented on this question, Defendant offers nothing to dispute that the officers saw the BMW fail to stop as it entered 2100 South. Accordingly, the officers had reasonable suspicion to stop the BMW that was being driven by Defendant for failing to stop before entering 2100 South.

2. *The officers had reasonable suspicion that the BMW was speeding*

Further, both officers, being POST certified and each having 12 years of experience enforcing traffic laws, reasonably believed that they observed the BMW speeding in violation of the law. (*See* Utah Code Ann. § 41-6a-601 (2005); Salt Lake City Traffic Code § 12.36.120(B) (2009).) Both officers testified that as soon as the BMW left the gas pump area and pulled onto 2100 South, it "accelerated at a high rate of speed." (Tr. at 12, 29.) In an attempt to catch up with the BMW, the officers noted that they were exceeding the speed limit by five to ten miles per hour and were still unable to catch up to the BMW. (Tr. at 12-13.) Specifically, Sgt. Garcia noted that the speed limit in a residential area (Commonwealth Avenue) was 25 miles per hour

9

and that the BMW, while traveling on Commonwealth Avenue, was "traveling well above 25 miles per hour." (Tr. at 69.) In fact, Sgt. Garcia looked at the speedometer in Detective Singleton's car while they were on Commonwealth Avenue and stated that they were traveling about 40 miles per hour. (Tr. at 71.) Clearly, the officers had a reasonable suspicion that a violation under state law justified a traffic stop of the BMW. *See Gregoire*, 425 F.3d at 876.

Defendant argues that "[f]or lower speeds and slight differences in speeds, mechanical verification is generally required to make an adequate showing for speeding" and cites *United States v. Sowards*, 690 F.3d 583, 592 (4th Cir. 2012), and *Kansas City v. Oxley*, 579 S.W.2d 113, 116 (Mo. 1979) for support. This argument is misplaced as both cases are distinctly different from the facts in the instant case.

In *Sowards*, the officer's speed estimation that the defendant was speeding was based solely upon a visual estimate of speed. 690 F.3d at 585-86. In this case, not only did two officers make visual estimates that Defendant was speeding, they also verified the violation by looking at their own vehicle's speedometer. Specifically, the speed limit on Commonwealth Avenue is 25 miles per hour and the officers could not catch up with the BMW even though the officers were traveling five to ten miles per hour over the speed limit. Furthermore, Sgt. Garcia looked at the speedometer in Detective Singleton's car and verified that the officers were traveling about 40 miles per hour. Thus, Defendant's speeding was verified by a mechanical device.

In *Oxley*, the case dealt solely with the sufficiency of evidence in proving "beyond a reasonable doubt" at trial that the defendant's committed a speeding violation. 579 S.W.2d at 113-17. The burden of proof in *Oxley* is significantly greater than the "reasonable suspicion" burden required here. *Gregoire*, 425 F.3d at 876.

The officers' observations that the BMW was speeding and that the BMW failed to stop before entering 2100 South are sufficient to give rise to reasonable suspicion. Accordingly, the officers were justified in stopping the BMW driven by Defendant.

II. Defendant Was Not in Custody for Purposes of *Miranda*

Defendant asserts that he was in custody when the officers stopped the BMW and approached Defendant and Faafita, and that without an advisement and waiver of his Constitutional Rights under *Miranda*, his statements should be suppressed. In support, Defendant argues that the officers were considering using a taser on Faafita, the officers had their hands on their weapons when they approached the BMW, and that both Defendant and Faafita were ordered to sit on the curb.

The court disagrees, and finds that Defendant was not in custody after being asked to sit on the curb. The officers were entitled to conduct a reasonable investigation after the traffic stop, including asking questions of Defendant who had been acting suspiciously. "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). By its terms, *Miranda* applies whenever "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Though a traffic stop significantly curtails the freedom of action of the driver and passengers of a vehicle, "*Miranda* warnings are . . . not implicated in the context of a valid *Terry* [traffic] stop." *United States v. Raynor*, 108 F.App'x 609, 613 (10th Cir. 2004). This is because traffic stops are ordinarily "brief, non-threatening, and conducted in the presence of others." *United States v. White*, 339 F.Supp.2d 1165, 1175 (D.Kan. 2004). "Where, however, the

11

traffic stop is effectuated using a level of force that 'reaches the boundary line between a permissible *Terry* stop and an unconstitutional arrest,' *Miranda* warnings may be required." *Raynor*, 108 F.App'x at 613 (*quoting United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993).

"The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). Additionally, "whether the suspect is in custody represents an objective determination." *Jones*, 523F.3d at 1239. In making this determination in the context of a *Terry* stop, courts consider the following factors: (1) whether and to what extent the defendant is told that he or she may refrain from answering questions (*United States v. Torres-Guevara*, 147 F.3d 1261, 1266 (10th Cir. 1998); (2) the tone and manner of the questioning, "where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave" (*Griffin*, 7 F.3d at 1518); (3) the separation of the defendant from sources of moral support (*Id*. at 1519); and whether police dominate the encounter (*See Berkemer*, 468 U.S. at 439-40).

To assess whether an encounter is police dominated, courts consider the degree of restraint placed upon the suspect being questioned, including whether the suspect is physically restrained or coerced, threatening presence of several officers, whether the suspect's driver's license or automobile registration is retained, and whether there is a threat of physical restraint created by the officer's display of a weapon. *United States v. Ortega*, 379 F.Supp.2d 1177, 1186 (D.Kan. 2005).

In this case, Defendant was not told that he did not have to answer questions, the questioning was brief and included Detective Singleton asking for a driver's license, registration,

and proof of insurance. Detective Singleton also asked Defendant if there was anything the officers needed to know about the vehicle because Detective Singleton was concerned there may be drugs or weapons in the car that could harm somebody or the officers. In addition, even though there were two police officers present at the scene, Detective Singleton was alone with Defendant when the initial questions related to the traffic stop were asked. The officers did not physically restrain Defendant in handcuffs or tell him that he was under arrest, draw their weapons,[6] withhold Defendant's identification or other belongings (Defendant did not have any identification), or purposefully separate him from Faafita.

Furthermore, it is true that after Defendant and Faafita voluntarily exited the BMW and started to walk away, the officers ordered them to stop and sit on the curb. However, this reduction of freedom is characteristic of a *Terry* traffic stop and permissible. *See Berkemer*, 468 U.S. at 436. Given the totality of the instant situation, Defendant was not in custody at the time he answered Detective Singleton's question, "if there was anything they needed to know about the inside of the vehicle." Accordingly, the questioning of Defendant initially after the traffic stop did not violate Defendant's Constitutional Rights under *Miranda*.

    III. The Physical Evidence Should Not be Suppressed

Even if the court were to find that Defendant's *Terry* stop confession was unlawfully

---

[6] Defendant asserts that the officers mere consideration of using a taser and having their hands on their weapons when they approached the BMW's occupants constituted custody for *Miranda* purposes. However, mere subjective consideration of using a taser is insufficient to constitute arrest because there is no objective basis to support that Defendant knew that fact. Also, officers simply placing their hands on their weapons while they approach the BMW would not necessarily transform an otherwise valid *Terry* stop into an arrest. In fact, actually drawing their weapons in a traffic stop situation does not necessarily invalidate the *Terry* status of the stop. *United States v. Hensley*, 469 U.S. 221, 235 (1985).

obtained, the physical evidence in this case would have inevitably been discovered.

The Tenth Circuit has recognized that "the ultimate or inevitable discovery exception to the exclusionary rule . . . applies when the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir.) (*citing Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). Specifically, those lawful means include warrantless inventory searches "conducted in accordance with established police department rules or policy and occur whenever an automobile is seized." *South Dakota v. Opperman*, 428 U.S. 364, 382, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976).

Given the facts in this case, it is inevitable that the drugs and the firearm would have been discovered. Detective Singleton ran Defendant's information through his police computer's data base and determined that Defendant did not have a valid driver's license, which subjected him to arrest. Officer Singleton also discovered that Faafita had an active arrest warrant. At that point neither Defendant nor his passenger could drive the BMW from scene. The BMW, therefore, was subject to impound. It is undisputed that it was the standard regular practice of the City of South Salt Lake Police Department to conduct an inventory search of a vehicle at the time it is impounded. Consequently, the discovery of the firearm and drugs inside the BMW would have occurred regardless of the other events of the evening.

## **CONCLUSION**

As a matter of law, the officers had reasonable suspicion to justify stopping the BMW driven by Defendant; Detective Singleton's *Terry* stop investigation was reasonable and justified, and, in any event, it was inevitable that the physical evidence in the vehicle would have been

discovered.

Defendant's motion to suppress is DENIED.

**It is so ordered.**

Dated this 11th day or August, 2014.

_____
Dee Benson
United States District Court Judge